# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

VITO CONGINE, JR.,

        Plaintiff,

    v.                            Case No. 11-C-0637

VILLAGE OF CRIVITZ and ALLEN BREY,

        Defendants.

---

## DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiff Vito Congine, Jr., filed this civil rights action against the Village of Crivitz and Marinette County District Attorney Allen Brey pursuant to 42 U.S.C. § 1983 for violating his rights under the First and Fourteenth Amendments. Congine alleges that his rights were violated when the Village police chief, after seeking Brey's advice, entered Congine's property on July 4, 2009, without a warrant and removed an American flag that Congine had been flying upside down. The case is before the court on the defendants' motion for summary judgment and Congine's motion for partial summary judgment. For the reasons set forth below, Congine's motion for partial summary judgment against the Village and Brey's motion will be granted. The balance of Congine's motion and the Village's motion will be denied.

## BACKGROUND

The parties are in general agreement concerning the facts leading up to July 4, 2009. Upset that the Village had denied him a liquor license for his business, Congine began flying an American flag upside down on the flagpole located in the parking lot of his property which he leased to a T-

shirt silk screening business. Congine, a former Marine, understood that flying the flag upside down was a symbol of distress, and he was attempting to convey his belief that he and his property were under distress as a result of the Village Board's actions. Unfortunately, others in the community viewed his conduct as a sign of disrespect for their country and its ideals.

Congine began flying the flag upside down in early to mid-June 2009. Either Congine or his neighbor Steven Klein, when Congine was traveling, would each day raise the inverted flag and then take it down in the evening. On July 3, 2009, Village Chief of Police Michael Frievalt received verbal complaints from citizens–primarily local members of the local American Legion chapter–who were apparently offended by the flag being flown upside down. At the time, Chief Frievalt stated he responded to the complaints by explaining that it was Congine's "right to do that." Congine was not present at the time, as he had been working in Illinois for several weeks leading up to July 4, 2009. Klein had been raising and lowering the inverted flag in his absence.

On July 4, 2009, the Village held its annual Independence Day parade, and it is at this point that the parties' versions of the events begin to differ. Congine's property, and the upside-down flag, were adjacent to the staging area for the parade where participants gathered to prepare for the parade start. According to the Village, the crowd that gathered along the parade route that day numbered between 3,000 and 4,000. Klein cites evidence suggesting it was far smaller, approximately 800.

Chief Frievalt arrived early in the morning and began closing down the parade route at approximately 7:00 a.m. so that the parade participants could begin setting up and for crowd control purposes. He was joined by Officer Craig Kasten, the Village's only other police officer, and two unsworn auxiliary officers who volunteered to assist with the parade  The first group in the parade were the members of the local American Legion chapter and its honor guard. Early in the morning,

2

some of the members of the American Legion, still angered about the flag being flown upside down, again complained to Chief Frievalt. The American Legion members were particularly upset because a soldier from near-by Peshtigo had recently been killed in action and a memorial to other soldiers killed in action had recently been on display in the area. According to Chief Frievalt and Officer Kasten, some people were shouting, and crowd members made threats to take the flag down themselves, cut down the flag pole, burn the building down, or cause bodily harm to the property owner.

Chief Frievalt and Officer Kasten attempted to calm people down, but as the crowd in the immediate area grew to several hundred, they became increasingly concerned that things could get out of control. Officer Kasten's testimony paints the scene from the Village's perspective and explains why it was not a simple matter of making an arrest:

> A    Being there with that temperament of that crowd and the anger and the comments that were made, it is not safe in my opinion to take – try and take one of those people into custody because I believe that would have led to an all-out riot or some sort of altercation. We have a two-man police department. We don't have a SWAT team. We don't have a – We have two men. Sheriff's department has very minimum coverage on holidays, minimum of three. They're busy at other functions in the county. It was my belief that for my safety and other people in the crowd, had we attempted to arrest those people making those threats, that we would have a full-scale riot on our hands.

> Q   And just so I'm understanding for our record sake and everything, when you say "riot," you know, what does the word "riot" mean to you? What's your understanding?

> A  A free-for-all. It would have been people pushing, shoving, hitting, destroying things, hurting people. People were extremely angry about that. It was a very volatile crowd. We did not have the manpower or resources to handle that crowd and attempt to make arrests out of it.

(ECF No. 39, ¶ 53.)

Congine, on the other hand, points to Klein's testimony as evidence that the situation was not anywhere near as dangerous and volatile as the defendants claim. Klein testified that he noticed

3

that the flag was being taken down at about 9:00 a.m., an hour before the parade was scheduled to start. At that time, there were only eight to twelve people within a block of the flagpole. Klein testified that he did not hear any commotion or loud noises before he noticed police taking down the flag. He also testified that most of the comments from people in the crowd were not threats that they intended to take action themselves, but suggestions or demands that the police or someone else do so. (ECF No. ¶¶ 41, 42.)

In any event, it is undisputed that the officers discussed how to handle the situation, and Officer Kasten called Marinette County District Attorney Allen Brey. Officer Kasten explained the situation, including that the crowd was unhappy, making threats, and demanding the police take action. Based on his understanding that there was a serious risk of riot and violence if the inverted flag was not removed, Brey advised Officer Kasten that he should try and locate the property owner and ask him to take it down. If the officers could not find the property owner or he refused to take it down, Brey instructed Officer Kasten that the officers should take the flag down and return it to the property owner after things calmed down. After Officer Kasten informed Chief Frievalt of Brey's advice, Chief Frievalt entered upon Congine's property and removed the flag. The flag was returned by the police without damage the next day.

## LEGAL STANDARD

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue of material fact requires specific and sufficient evidence that,

4

if believed by a jury, would actually support a verdict in the non-movant's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322. In determining whether to grant a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ANALYSIS

**A.**     **First Amendment Claim**

The First Amendment protects conduct, symbols, and non-verbal speech that express ideas or convey a particularized message reasonably understood by viewers. *Texas v. Johnson*, 491 U.S. 397, 404-06 (1989); *Spence v. State of Washington*, 418 U.S. 405, 409-11 (1974) (per curiam). In *Johnson*, the Supreme Court held that the act of burning American flag during protest rally was expressive conduct within the protection of the First Amendment. *Johnson*, 491 U.S. at 406. From this holding, it clearly follows that Congine's public display of an upside-down flag is likewise protected symbolic speech. Though the message Congine intended could have been conveyed in a more direct and less offensive manner, the First Amendment has been broadly construed to protect both the message and the manner in which it is expressed. *See Cohen v. California*, 403 U.S. 15, 20 (1971) (holding that wearing jacket with the words "Fuck the Draft" in public constitutes protected speech); *see also Spence*, 418 U.S. at 410 ("In many of their uses flags are a form of symbolism comprising a 'primitive but effective way of communicating ideas . . .,' and 'a short cut

5

from mind to mind.'") (quoting *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 632 (1943)). Yet, the protections afforded by the First Amendment are not absolute, and the government may regulate certain categories of expression consistent with the Constitution. *Virginia v. Black*, 538 U.S. 343, 358 (2003).

For instance, the First Amendment does not protect speech that constitutes "fighting words" consisting of "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Cohen*, 403 U.S. at 20 (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)). Neither does the First Amendment protect "true threats" that communicate a "serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals," regardless of whether the speaker intends to carry out the threat. *Black*, 538 U.S. at 359-60. Also unprotected is speech directed to inciting or producing imminent lawless action that is actually likely to incite or produce such action. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam). But short of "a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest," speech will generally be protected and may not be abridged or censored. *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) ("Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.").

Defendants argue Congine's symbolic expression created a clear and present danger of imminent physical injury or property damage on July 4, 2009, and therefore, his speech was not protected under the First Amendment. They argue that the crowd viewing the inverted flag on the

6

day of the parade was shouting and angry, making threats to cut down the flag or to burn down

Congine's building, and threatening to physically harm Congine. They further contend that the

crowd was growing large on the morning of July 4, 2009, with several hundred people in the

immediate area of the flagpole and thousands of spectators on hand for the parade. Furthermore,

the two officers claimed they were outnumbered and without options for calling back-up. Under

the circumstances, they believed the crowd was getting out of control and might act on its threats.

Both officers testified to their fears, describing the situation in grave terms:

> The way the situation was at that time and how it was starting to escalate and build,
> I took it all very serious, and I think at that time if one little thing would have
> happened, it would have escalated into a large-scale event. It would have been one
> person throws a rock, and then everybody throws a rock. And then a car gets flipped
> over and this happens and that happens, and nobody knows why it's happening
> because one person did a little thing. It was to the point of this is getting out of
> control.

(Frievalt Dep. 22, ECF No. 48). Chief Frievalt continued to explain the imagined mayhem that

might have resulted, stating he feared that all it would take was for someone to "throw a little thing

into it, and it completely grows and escalates into all of a sudden you have people getting punched

and kicked and windows being smashed and things getting broken, and nobody even knows why

they're doing it." (Frievalt Dep. 24, ECF No. 48.)

Officer Kasten claimed that he believed that "for my safety and the other people in the

crowd, had we attempted to arrest those people making those threats, that we would have a full-

scale riot on our hands." (Kasten Dep. 36, ECF No. 47.) He estimated that based on his observation

that the crowd was volatile, there might have been a "free-for-all" with people "pushing, shoving,

hitting, destroying things, hurting people" if the officers did not act. (Kasten Dep. 36, ECF No. 47.)

He also stated that making arrests was not feasible given the size of the crowd and the limited

resources and manpower of the police department; therefore, it was determined that removing the

flag was the only option. Brey also notes that the environment was emotionally charged because a local soldier had very recently been killed while serving in Afghanistan. In addition, Brey argues that local veterans had raised money for the Vietnam Memorial Moving Wall to be displayed in the area, and they were therefore particularly insulted by what they perceived as Congine's unpatriotic and irreverent display of the American flag. Given these considerations and the July 4 holiday, Brey argues that the inverted flag deeply upset veterans and parade observers.

Congine argues that even if everything the defendants have claimed is true, he still prevails on his First Amendment claim. He notes that courts have not allowed government "to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression, asking whether the expression 'is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *Johnson*, 491 U.S. at 409 (quoting *Brandenburg*, 395 U.S. at 447). In Congine's view, "whether the situation is labeled 'clear and present danger' or 'imminent lawless action,' government may suppress speech only if the speaker *intended* to provoke such conditions." (EFC No. 63, at 1) (italics original). Because there is no evidence to suggest that he intended to provoke a disturbance (in fact, he wasn't even there), Congine argues that "the exception, however labeled, does not apply." (*Id.*)

The exception on which the defendants rely is not as narrow as Congine contends. The intent of the speaker is no doubt crucial if the government seeks to impose criminal liability on the speaker for the speech itself. *See, e.g., Brandenburg* 395 U.S. at 447-48; *Hess v. Indiana*, 414 U.S. 105, 108-9 (1973); and *Texas v. Johnson*, 491 U.S. at 409. But neither the Village, nor any other governmental entity sought to punish Congine for inciting a riot or any other crime. What they were trying to do is prevent a riot. "[W]hen, for whatever reason, immediate danger to speakers and

8

protesters exists, the Court has held that speech may be curtailed to prevent a riot or serious bodily injury to those gathered." *Bell v. Keating*, 697 F.3d 445, 457 (7th Cir. 2012) (citing *Feiner v. New York*, 340 U.S. 315, 321 (1951). But it is not enough that violence is merely possible.

There must be more than the mere potential for a breach of the peace to justify censorship of expressive conduct. *Johnson*, 491 U.S. at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *see also Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134-35 (1992) ("Speech cannot be . . . punished or banned, simply because it might offend a hostile mob."); *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973) (finding "no evidence or rational inference" that indicated Hess's words were intended to produce or likely to produce imminent disorder, and therefore, his words "could not be punished by the State on the ground that they had a tendency to lead to violence"); *Feiner v. New York*, 340 U.S. 315, 321 (1951) ("We are well aware that the ordinary murmurings and objections of a hostile audience cannot be allowed to silence a speaker, and are also mindful of the possible danger of giving overzealous police officials complete discretion to break up otherwise lawful public meetings.").

Moreover, even if violence is imminent, temporary interference with the speaker's exercise of his First Amendment rights is permissible only as a last resort when police are otherwise unable to protect the safety of the public and only insofar as necessary to avoid the serious harm. In other words, there must be no other means of avoiding serious bodily injury or destruction. As Congine points out, it is well-settled that a person's First Amendment rights "are not subject to the heckler's veto." *Nelson v. Streeter*, 16 F.3d 145, 150 (1994) (citing *Cox v. Louisiana*, 379 U.S. 536, 551 (1965)); *accord*; *Ovadal v. City of Madison, Wisconsin*, 416 F.3d 531, 537 (7th Cir. 2005) ("The police must preserve order when unpopular speech disrupts it; '[d]oes it follow that the police may

9

silence the rabble-rousing speaker? Not at all. The police must permit the speech and control the crowd; there is no heckler's veto.'") (quoting *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir. 1993)); *Snyder v. Phelps*, 131 S.Ct. 1207, 1220 (2011) (explaining that the reaction even to speech that inflicts great pain on its audience must not be to punish the speaker because "[a]s a nation we have chosen a different course–to protect even hurtful speech on public issues to ensure that we do not stifle public debate"). Thus, only when it is otherwise unable to prevent substantial bodily harm and destruction may law enforcement temporarily intrude on an individual's First Amendment rights.

Even accepting the defendants' version of the facts as true, the conditions needed to justify governmental interference are not met here. Although the officers testified that they feared the crowd becoming violent, they also testified that they believed the crowd was only angry at the owner of the flag. Yet, the officers knew that Congine owned the flag and that he was not at home. As such, the threats of "bodily damage or bodily harm being done to the owner of the property" could not have been a credible basis on which Chief Frievalt believed he needed to act. (Frievalt Dep. 20, ECF No. 48.) The threat by some in the crowd to take the flag down themselves was likewise insufficient to justify law enforcement's actions. Given the fact that the outrage expressed was over the disrespect being shown to the flag, it is doubtful that merely taking it down would have led to an uncontrolled riot endangering the safety of others. Those who were sensitive to the disrespect shown to the flag by flying it upside down were not likely to tear it to pieces or otherwise engage in violent behavior while lowering it. Presumably, they would have simply lowered and removed it, or perhaps turned it right side up and raised it back up the flagpole. It might have been different if Congine was there defiantly facing a large uncontrollable crowd by himself. But he was in Illinois and Klein was inside his own house. Even under the defendants' version of the facts, violence was

10

not imminent.

The defendants suggest that even though Congine was not even present, the inverted flag flying over his property created an atmosphere among the Fourth of July celebrants that was like a powder-keg ready to explode into a violent riot if law enforcement had attempted to make an arrest. But if that was the case, then there was no need to make an arrest at that time and place. If the conditions were such that the Village police could not safely make an arrest, there was nothing to prevent them from simply taking note of who took the flag down and dealing with it later. If because of the small size of the Village police force they were unable even to keep watch over Congine's property and perform the other duties required to insure the parade proceeded in a safe manner, again there was no requirement that they guard Congine's flag pole. Congine may have the right to freely express his views in the manner he chooses, but he has no right to around-the-clock police protection. The inability of the police to provide such protection is not a justification for their interfering with a citizen's right to free speech. By treating it as such, Chief Frievalt allowed his department to become the instrument of censorship for those who were upset over manner in which Congine chose to express his displeasure with the Village Board.

This is not to suggest that Chief Frievalt acted with the intent to violate Congine's First Amendment rights. To the contrary, it seems clear that he was motivated by a desire to protect the safety of the public that had gathered for the parade. He took no action to prevent Congine's display in the weeks leading up to the July 4th celebration or in the months that followed. He acted only when the crowd began to assemble for the parade and he heard some expressing outrage and threatening to take matters into their own hands. His concern was understandable, and courts must take care to avoid second-guessing law enforcement officers who are forced to make difficult judgments at the scene under extreme pressure. Courts must also be mindful, however, that it is an

11

essential part of good law enforcement to anticipate potential problems and guard against the risk of harm long before it occurs. Thus, the very nature of their job requires law enforcement officers to envision and take steps to avoid worst case scenarios. But while it may be a good practice for law enforcement officers to envision worst case scenarios, they cannot intrude on protected speech on the basis of such scenarios, absent a clear and present danger. If the mere possibility of violence is sufficient to justify government intrusion, this essential freedom can become little more than a mirage.

The court thus concludes that even assuming the facts set forth by the defendants are true, the intrusion upon Congine's protected speech was not justified under the circumstances of this case. Congine's motion for summary judgment will therefore be granted as to this issue and the defendants' motions will be denied.

**B.     Fourth Amendment Claim**

The Village also seeks summary judgment on Congine's Fourth Amendment claim. The Village argues that there was no Fourth Amendment violation because Congine cannot prevail under a theory that there was an unreasonable search or that there was an unreasonable seizure. Congine contends that he is only asserting that there was an unreasonable seizure of his property here, namely, his flag. *See Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 68 (1992) ("[S]eizures of property are subject to Fourth Amendment scrutiny even though no search within the meaning of the Amendment has taken place."). Even temporary seizures are within the scope of the Fourth Amendment, so long as there is "some meaningful interference with an individual's possessory interest." *United States v. Jacobsen,* 466 U.S. 109, 113 (1984); *accord United States v. Place*, 462 U.S. 696 (1983). But so long as a seizure is reasonable, it will survive constitutional scrutiny. *Soldal*, 506 U.S. at 71. Reasonableness is determined by a "careful balancing of governmental and

private interests." *Id.* (quotations omitted). Thus, a court must balance the "nature and quality of the intrusion" on the individual against the "importance of the governmental interests alleged to justify the intrusion." *Jacobsen*, 466 U.S. at 125 (quotations omitted).

The Village argues that there was no meaningful interference here because Plaintiff was not present when the flag was taken, he was leasing the commercial property upon which the flagpole was situated, and it is possible his neighbor raised one of his spare flags such that Plaintiff may not have owned the flag the defendants removed. It is difficult to comprehend how forcibly and publicly removing personal property that the plaintiff was displaying in order to express his views about his local government–to the clapping and cheering of onlookers–is not meaningful. Moreover, the absence of Congine's physical presence at the time of the seizure is irrelevant–the fact that Congine was not in town cannot mean that his Fourth Amendment rights left town with him. Similarly immaterial is the fact that the flag was returned to Congine the next day. *See Nelson*, 16 F.3d at 151. The suggestion that the flag might not have been owned by Congine is refuted by Klein's testimony that the flag belonged to Congine because he had given it to him. Thus, the sole question remaining is whether the seizure of the flag was reasonable.

From what has been said already, it necessarily follows that it was not. If the law enforcement officers were not justified in taking Congine's flag down, they were likewise not justified in seizing it, even if only for twenty-four hours. Absent any justification to remove the flag, the seizure must be found unreasonable. The Village's motion for summary judgment on this claim must therefore be denied. And even though Congine has not addressed the issue separately, the court concludes that summary judgment should be granted in his favor in this claim as well.

13

## C.    Municipal Liability

Regardless of whether there has been a constitutional violation, the Village argues that it cannot be liable under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978). Municipalities are not liable under § 1983 unless a plaintiff proves that the constitutional violation was caused by (1) an express municipal policy; (2) a widespread, although unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011); *Monell*, 436 U.S. at 694.

The parties primarily direct the Court's attention to the third basis for liability, and dispute whether Chief Frievalt was a policymaker who possessed final authority to decide what action to take on July 4, 2009. Individual government agents may possess final authority to establish municipal policy only if they possess such authority with respect to the action ordered. *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481 (1986). Municipal liability may attach to a single decision to take unlawful action made by a municipal policymaker, but only where "a deliberate choice to follow a course of action is made from among various alternatives." *Id.* The inquiry "is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker 'in a particular area, or on a particular issue.'" *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (quoting *Kujawski v. Bd. of Comm'rs of Bartholomew County, Ind.*, 183 F.3d 734, 738 (7th Cir. 1999)); *see also McMillian v. Monroe County*, 520 U.S. 781, 785 (1997).

Here, the relevant inquiry is whether Chief Frievalt was a policymaker on decisions regarding law enforcement action or public safety during the parade. *See Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011). The identification of policymaking officials is a question of law, to be determined by looking to the relevant state law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701,

Case 1:11-cv-00637-WCG   Filed 05/28/13   Page 14 of 22   Document 70

737 (1989) (citing *Pembaur*, 475 U.S. at 480; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (plurality opinion)).  In determining whether an official is a final decisionmaker, it is also helpful to determine "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."  *Valentino*, 639 F.3d at 748 (internal quotations omitted).  A key question is whether the decisionmaker "was at the apex of authority for the action in question."  *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468-69 (7th Cir. 2001) (explaining that "final" decisionmaking authority means that the official has authority "that is final in the special sense that there is no higher authority").

Contrary to the Village's arguments, a chief of police may make a decision sufficient to constitute municipal "policy," while the actions of other low-level officers may not.  For example, in *Vodak*, the plaintiffs sued the City of Chicago and several police officers for violating their Fourth Amendment rights when the officers arrested them during a large anti-war demonstration.  *Id.* at 747-48.  The court rejected the city's argument that only city council members acting through ordinances could be policymakers for the city; rather, the court found that while the city council could enact ordinances that constrain the police superintendent's authority to act in such situations, it had not done so.  *Id.* at 748.  As such, the superintendent had the final authority to make policy regarding the particular issue of determining how to handle public safety issues during a large-scale demonstration.  *Id.* at 748. The court noted that the superintendent had the sole responsibility to control the demonstrations, and during the events at issue, he was monitoring and approving the decisions of his subordinates, including the decision of whether to make mass arrests.  Therefore,

the "superintendent *was* the City, so far as the demonstration and arrests were concerned." *Id.* (emphasis in original).

Under Wisconsin law, a village's police chief is similarly a final policymaking official with regard to the situation at hand here. In Wisconsin, a village police chief must obey all written orders of the village board. *See* Wis. Stat. §§ 61.28, 61.29, 61.31; *c.f. Chortek v. City of Milwaukee*, 356 F.3d 740, 749 (7th Cir. 2004) (finding a city police chief is charged with command and rule-making responsibilities of the police department under Wisconsin law) (citing Wis. Stat. § 62.09(7)(c) & 13(a)). However, this does not mean that the police chief does not have final policymaking authority with regard to individual decisions regarding enforcement of the laws and keeping the peace. Village police are granted several decisionmaking responsibilities under state law that are independent of approval by the village board, including the power to "arrest with or without process every person found in the village engaged in any disturbance of the peace or violating any law of the state or ordinance of the village," § 61.28, and to "[c]ause to be prosecuted all violations of law of which the constable has knowledge or information," § 61.29. It is not enough that an officer have "final" decisionmaking power to make ad hoc decisions, such as to make arrests. However, here, Chief Frievalt was the final arbiter in determining how to handle the approach of law enforcement in maintaining order and safety during the parade. Moreover, Chief Frievalt's decision was a deliberate choice made among various alternative actions. He did not consult with the Village Board, and there is nothing to suggest that he was otherwise constrained by the Board's authority on this matter. Tellingly, Chief Frievalt took the time to call Brey for advice, but took no similar action to ask for permission from the board or any other authority.

However, the Village's Police Department Policy Book provides that the chain of command in the department is as follows: (1) Village Board; (2) Public Safety Committee; (3) Chief of Police;

16

(4) Patrolman. (Frievalt Decl. Ex. C at 4, ECF No. 40-3.) The Village argues that therefore, because the chief of police is only the "first step" in the chain of command for resolving a problem, and because the Public Safety Committee and the Village Board have oversight responsibilities, Chief Frievalt was not the final policymaker with regard to deciding what action to take to maintain public safety on July 4, 2009. The Village also contends that the authority to set policy and to adopt rules for the conduct of government is different than the authority to merely implement pre-existing rules. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 740 (7th Cir. 2008) (quoting *Killinger v. Johnson*, 389 F.3d 765, 771-72 (7th Cir. 2004). But Chief Frievalt was not simply implementing the law, he was making a discretionary decision as to how the Village would react to a public safety issue. Although he consulted with Brey, Chief Frievalt was the ultimate authority in determining the city's response.

The Village also argues that Congine's claim against it is barred because the Amended Complaint failed to allege that Chief Frievalt was a "final policymaker." However, there is no heightened pleading requirement for municipal liability. *Leatherman v. Tarrant County*, 507 U.S. 163, 164 (1993). In any case, at the summary judgment stage, the Court does not examine the pleadings alone; the Village might have raised such an argument on a motion to dismiss, but there is sufficient evidence before the Court to make a finding on the issue on the merits. Accordingly, because Chief Frievalt was in effect acting as the Village in making the decision to remove Congine's flag on July 4, 2009, the Court determines that municipal liability is appropriate here.

**D.     Qualified Immunity**

Finally, District Attorney Brey argues that regardless of whether Congine prevails on his claims that his constitutional rights were violated, he is immune from the payment of money damages under the doctrine of qualified immunity. Although prosecutors enjoy absolute immunity

17

from liability under 42 U.S.C. § 1983 for their conduct in initiating and presenting a criminal case in court, *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976), this same absolute immunity does not extend to legal advice they give to police. *Burns v. Reed*, 500 U.S. 478, 496 (1991). In the area of providing legal advice to law enforcement officers, prosecutors enjoy only the same qualified immunity that most government officials have. But even qualified immunity is a significant shield.

"Government officials performing discretionary functions are shielded from damage liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Although qualified immunity is a defense to a § 1983 suit, the burden of meeting the elements of this two-part test rests on the plaintiff." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). Thus, in order to overcome a defense of qualified immunity, the plaintiff in a § 1983 case must prove (1) that the defendant's conduct violated the plaintiff's federal statutory or constitutional rights, and (2) the right at issue was clearly established at the time of the defendant's conduct. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). The doctrine balances two important interests—the need to hold government officials who abuse their offices accountable, and the need to minimize the risk that the "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The protection afforded by the doctrine is quite broad as it "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as 'officers of reasonable competence could disagree on this issue, immunity should be recognized.'" *Wagner v. Washington County*, 493 F.3d 833, 837 (7th Cir. 2007) (quoting *Malley*, 475 U.S. at 341).

Qualified immunity poses a question for the court, not a jury. *Vinning-El v. Evans*, 657 F.3d 591, 595 (7th Cir. 2011) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam)). As discussed, the Court is satisfied that Congine's First and Fourth Amendment rights were violated when the Village police removed his flag. Thus, the sole issue remaining for purposes of determining whether Brey is immune from money damages is whether existing, clearly established federal law would have alerted a reasonable person confronted with the same situation that removing the flag would violate Congine's rights.

Congine argues that Brey is not immune from liability because, as the cases cited above demonstrate, the right to freely express one's views, even in a manner many find offensive, was well-established at the time Brey advised Officer Kasten that the Village police could remove his flag. The fact that the right to express one's views in such a manner was well-established, however, is not dispositive. "Immunity protects public employees who make reasonable errors in applying even clearly established law." *Vinning-El v. Evans*, 657 F.3d at 594.

It was also well-established, Congine argues, that the clear and present danger exception on which Brey relies requires proof that "the speaker intended to incite violence or lawless action." (ECF No. 61, at 2.) Since there was no evidence that he had any intent to incite violence, Congine argues that the exception clearly does not apply and Brey's advice to remove Congine's flag was in clear violation of his constitutional rights. But as explained above, the speaker's intent to incite violence must be proved only if the state seeks to prosecute the speaker for a crime; it is not necessary if the officer seeks only to temporarily interfere with the speaker's exercise of his First Amendment rights in order "to prevent a riot or serious bodily injury to those gathered." *Bell v. Keating*, 697 F.3d at 457.

19

Still, the court has concluded that even though Congine's intent did not matter, the Village had no right to remove his flag under the circumstances presented. Was Brey's advice to the contrary so inconsistent with clearly established law as to warrant personal liability? To answer that question, we must view Brey's advice in context.

Brey had been the district attorney of Marinette County, a rural county north of Green Bay, since 2008. On the morning of July 4, 2009, he was at his home when he received a telephone call from Officer Kasten. Officer Kasten told Brey that he needed his advice because he was he was afraid there was going to be a civil disturbance or riot in Crivitz. At the time, Brey did not know Congine or that it was his flag that was at issue. Based on his discussion with Officer Kasten, Brey thought there were thousands of people at the parade and several hundred around the flagpole. He also thought the parade was scheduled to start in a few minutes. (ECF No. 62 , ¶¶ 11, 13; ECF No. 49, ¶ 4.) Brey believed that the community was very patriotic and emotional at the time because a young man from near-by Peshtigo had been killed in the line of duty in Afghanistan and the funeral was to take place a few days after the parade. (ECF No. 62, ¶¶ 38-40.) From his conversation with Kasten, it is apparent that Brey thought that violence was imminent and could only be avoided by removing the flag. After balancing the free speech rights of the person flying the flag against the obligation to maintain public safety and order, Brey advised Kasten to try and locate the person who was flying the flag and ask him to remove it because it was causing a disturbance. If he could not find him, or the person refused, Brey told Kasten that police should remove it and give it back later. (Id. ¶¶ 50-54.)

In many respects, Brey's position was similar to that of a police officer asked to make a split second decision as to the amount of force to use in order to prevent a crime or make an arrest. Because of the risk of injury and the uncertainty inherent in such situations, courts give the decision

20

officers make under such circumstances a certain amount of deference. In *Graham v. Connor*, 490 U.S. 386 (1989), for example, the Court noted with respect to cases involving allegations of excessive force cases that "because police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation," *id.*, at 397, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective, *id.*, at 396. The Court set out a test that cautioned against the "20/20 vision of hindsight" in favor of deference to the judgment of reasonable officers on the scene. *Id.*, at 393, 396. Recognizing the difficulty of such judgments, the Court in *Saucier* held that further level of deference was appropriate when the issue was one of qualified immunity. 533 U.S. at 205-06.

Here too, it would seem some deference is appropriate. Brey was asked to decide within a few minutes whether police could temporarily remove an inverted American flag in order to avert what he was told by a trusted law enforcement officer was imminent violence at the Fourth of July parade. Brey decided that the danger of people getting hurt was more important than the temporary intrusion on an unknown individual's right to fly his flag upside down. He therefore directed police to remove the flag. Given the circumstances and information he was provided, his decision was not so clearly wrong as to warrant liability under § 1983. His advice was not plainly incompetent or a knowing violation of law. Accordingly, regardless of whether the defendants' actions violated Congine's constitutional rights, Brey is entitled to qualified immunity.


**CONCLUSION**

Accordingly, based on the foregoing discussion, Congine's motion for summary judgment will be granted in part and denied in part. Congine's partial motion for summary judgment will be

21

granted as to the liability of the Village on his First Amendment claim.  However, having found that Brey is entitled to qualified immunity, Congine's motion will be denied as to Brey.  Furthermore, based on the foregoing, the Village's motion for summary judgment will be denied and Brey's motion for summary judgment will be granted.  The court sua sponte grants summary judgment on Congine's Fourth Amendment claim as well.  The Clerk is directed to set this matter for Rule 16 conference to discuss further proceedings.  Counsel may appear by telephone.

**SO ORDERED** this 28th day of May, 2013.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court